IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| AWP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 3:19-cv-734-CRS |
| | ) | |
| SAFE ZONE SERVICES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **DECLARATION OF SAM MYERS**

I, Sam Myers, declare as follows:

1. I am over eighteen (18) years of age, of sound mind, and competent to testify.

2. I understand that defendants have moved to exclude my opinions in this case. The purpose of this declaration is to respond to some of the representations contained in defendants' motion and to describe my qualifications and the methods I used in my work on this matter.

3. I obtained a Bachelor of Science degree in Labor Economics in 2016.

4. In January of 2017 I began employment with AWP, Inc. ("AWP") as a Data Analyst in AWP's Analytics Department.

5. As a Data Analyst, I analyzed different components of AWP's data to provide reports and projections to the company. This included analyzing AWP's financial data to forecast the fiscal performance of AWP into the future. I prepared my forecasts of future financial performance based on numerous data points such as market trends, AWP's accounting records, and customer behavior. Relying on commonly accepted economic principles, I used that data to

EXHIBIT A

prepare reports forecasting AWP's expected revenue growth (or decline). As a Data Analyst, I also presented my projections to AWP's executive team on a monthly basis.

6. In late 2018, I was promoted to Director of AWP's Analytics Department, which is the highest-ranking position within the department. I remain in that position presently.

7. As Director of AWP's Analytics Department, I continue to prepare forecasts of AWP's future fiscal performance and to present my forecasts to AWP's executive team on a monthly basis. I also regularly present my forecasts and opinions to AWP's board of directors. I also routinely present my forecasts and opinions to AWP's managers across the country regarding the managers' respective regions.

8. As Director of AWP's Analytics Department, I also assist AWP in preparing budgets based on my fiscal projections.

9. I have authored two reports in this case. I authored a report dated June 11, 2021 and a supplemental report dated August 11, 2021.

10. As part of my June 11, 2021 report I performed a regression analysis, which is a reliable and accepted economic forecasting method, to project the revenue that AWP expected to realize in the Louisville market from customer PPL between the third quarter of 2019 and the first quarter of 2021.

11. AWP entered the Louisville market near the end of the second quarter of 2017. To perform my regression analysis, I relied on AWP's Louisville financial data from the first full quarter that AWP performed services in Louisville – the third quarter of 2017, through the end of the second quarter of 2019.

12. Based on the two years of historical revenue data available, I determined that AWP lost $3,942,756 in PPL revenue from the third quarter of 2019 through the first quarter of 2021.

13. I calculated the profit AWP lost from this PPL revenue by analyzing AWP's year-by-year overhead and expenses in the Louisville market, as reflected on AWP's profit and loss statements. Taking into account AWP's variable overhead and expenses (costs such as payroll taxes, fuel costs, vehicle insurance, and other costs that vary based on volume of work, as opposed to costs that remain constant such as office rent and office utilities), I determined that AWP's lost $3,942,756 in revenue from PPL resulted in AWP losing $1,044,521 profits from PPL between the third quarter of 2019 and the first quarter of 2021.

14. To account for possible causes of AWP's lost PPL business other than the unlawful conduct alleged by AWP in this lawsuit (for example business lost due to lawful competition or due to the COVID pandemic), I then reduced my total lost profit number to the proportion of work directly performed by former AWP employees on behalf of Safe Zone in the field.

15. To determine the portion of Safe Zone work performed by former AWP employees, I relied on a reliable and well-recognized computer code to randomly select 50 of the 478 workdays between the third quarter of 2019 and the first quarter of 2021.

16. I then directed a Data Analyst working under me, James Imhoff, to review Safe Zone's work schedules and document the number of former AWP employees with non-compete agreements working for Safe Zone on each of those 50 days, the total number of AWP employees (those with and without non-compete agreements) working for Safe Zone on each of those days, and the total number of Safe Zone employees working for Safe Zone on each of those days. Mr. Imhoff is also an economist with a Bachelor's and Master's degree in Economics.

17. In my profession, economists regularly rely on others to perform clerical tasks such as transposing, compiling, or inputting objective data points.

18. I spot checked a portion of Mr. Imhoff's inputs to confirm there were no errors and then based on the 50-day sample, I was able to calculate the percentage of Safe Zone's work force comprised of former AWP employees on an annualized basis for the years 2019, 2020, and 2021 – including the percent of the work force comprised of former AWP employees with non-compete agreements and the percent of the work force comprised of all former AWP employees (inclusive of former employees with and without non-compete agreements).

19. Each of the former AWP employee's performing work for Safe Zone in the field had previously worked for PPL when they were employed with AWP. AWP had the capacity to employ these former employees and requests from PPL to perform more work than AWP could staff. Thus, I determined that as a result of not being able to put the former employees to work to meet PPL's requests, whether as a result of the former employees' resignations or terminable offenses, AWP lost the profits that it would have realized on that PPL work and that was, instead, realized by Safe Zone.

20. Thus, after calculating the percent of Safe Zone's work force that was comprised of former AWP employees, I decreased AWP's total lost profits to the proportion of Safe Zone work performed directly by former AWP employees in the field – employees that could have performed work for PPL on behalf of AWP if the employees had remained employed by AWP.

21. I determined that AWP lost $185,972 in profit as a result of work performed by former AWP employees subject to non-compete agreements and AWP lost $351,648 in profits as a result of work performed by all former AWP employees (inclusive of former employees with

and without non-compete agreements). Limiting my lost profit conclusions in this manner allowed me to avoid speculating as to what portion of AWP's lost profit was caused by the conduct alleged by AWP in this lawsuit versus the portion caused by other factors.

22. Subsequent to the authoring my June 11, 2021 report, I learned that certain revenue inputs contained within my report were incorrect.

23. First, a handful of Safe Zone's invoice statements were transposed incorrectly into my calculations. It is my understanding that Safe Zone produced 602 invoice statements and credit memos in this case. AWP's counsels' office prepared a spreadsheet which transposed the revenue information from Safe Zone's invoices and credit memos into a single document. I spot checked a portion of the entries on this document and did not find any errors. I then relied on the document when inputting Safe Zone's revenue information into my calculations.

24. After authoring my June 11, 2021 report I discovered that the dollar amounts from a small number of the 602 invoice statements and credit memos had been transposed incorrectly into the document prepared by counsels' office.

25. These type of transcription errors are not uncommon when dealing with large financial data sets. Indeed, the expert retained by defendants to rebut my opinions also relied on incorrect revenue inputs in his report. Defendants' expert, or the assistant that transposed the data for him, input incorrect dollar amounts from Safe Zone's invoice statements and failed to account for the credit memos produced by Safe Zone, which resulted in incorrect calculations.

26. Second, my June 11, 2021 report relied on AWP revenue data from the Louisville market that was "mapped" incorrectly. AWP "maps" incoming revenue to specific customer

accounts and some of the data that I relied upon in my initial report was incorrectly mapped internally by AWP to the wrong customer account.

27. After learning of the inaccurate inputs in my June 11, 2021 report, I authored my August 11, 2021 supplemental report to correct those inaccurate inputs. In authoring my supplemental report, I also reviewed each Safe Zone work schedule and further confirmed that the random sampling I performed of Safe Zone's work schedules resulted in a representative sample of the entire data set.

28. As a result of my input corrections in the supplemental report, my numbers changed slightly. I originally calculated $3,942,756 in lost PPL revenue, but that number decreased to $3,804,991 after the revenue inputs were revised. My calculation of $1,044,521 in gross lost profit decreased to $1,006,985. Lastly, the amount of lost profit caused by defendants' conduct changed from between $186,972 to $351,648 to between $185,502 to $358,822.

29. I understand that in moving to exclude my opinions, defendants contend that I testified I was "intellectually dishonest" in performing my work and that I "overstated" my lost profit calculations. These contentions are false.

30. I never testified that I was intellectually dishonest. My work in preparing my opinions was conducted honestly and to a reasonable degree of professional certainty.

31. Likewise, I did not testify, nor do I believe, that my calculations are overstated. As I explained at my deposition, it is my opinion that AWP's profit loss does not cease accruing at the end of a twelve-month term. During the initial twelve months that defendants unlawfully competed with AWP, Safe Zone gained business and market share with AWP's customer, and I

do not believe it is reasonable to assume that the entirety of that business and market share would simply revert back to AWP after twelve months.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 22, 2021.

_____
Sam Myers