UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

AWP, INC.                                                              PLAINTIFF

v.                                          CIVIL ACTION NO. 3:19-CV-00734-CRS

SAFE ZONE SERVICES, LLC, *et al.*                                     DEFENDANTS

## MEMORANDUM OPINION

This case is before the Court on several motions. Plaintiff AWP, Inc. ("AWP") has filed a motion for partial summary judgment (DN 96) on Count I (breach of contract) against Defendants Virginia Glidewell ("Glidewell"), Bruce Cox ("B. Cox"), Tony Whited ("Whited"), Jamaizz Baker ("Baker"), Mary DeCruz ("DeCruz"), George Kirby ("Kirby"), Tikesha McLean ("McLean"), Anthony Cox ("A. Cox"), LaQuana Persley ("Persley"), and David Miller ("Miller") (collectively, "Former Employees") and Count II (tortious interference with contract) against Safe Zone Services, LLC ("Safe Zone"). Former Employees and Safe Zone have responded (DN 104) and AWP has replied (DN 113). All Defendants, including Former Employees, Samantha Bartley ("Bartley"), Safe Zone, United Electric Company, Inc. ("United Electric"), Daniel Walsh ("Walsh"), and Mark Hatcher ("Hatcher") (collectively, "Defendants"), have jointly filed a motion for summary judgment on all claims against them (DN 95). AWP has responded (DN 106) and Defendants replied (DN 112). All Defendants have also jointly filed a motion to exclude the expert testimony and report of Sam Myers from the trial of this action (DN 94), to which AWP has responded (DN 105) and Defendants have replied (DN 111). Finally, AWP has filed two motions for leave to seal documents. (DN 97 and DN 107). All matters are ripe for adjudication. For the

1

reasons discussed below, summary judgment will be granted in favor of Defendants on all claims asserted by AWP.

## I.    Factual Background

Except where noted, the following facts appear to be undisputed. AWP is a traffic safety company incorporated and organized under the laws of the State of Ohio and with a principal place of business in Ohio. First Amended Complaint, DN 54, PageID# 700, 704. AWP has operations in Louisville, Kentucky and, "[a]mong other things, . . . supplies its customers with work crews and equipment to provide traffic control operations at active traffic control sites, designs and implements traffic control patterns, and oversees traffic control procedures." *Id.*, PageID# 704.

Louisville Gas and Electric ("LG&E") often hires electrical contractors to perform work on the utilities LG&E manages. Glidewell Depo., DN 106-11, PageID# 2211-13. When working at an LG&E worksite, these contractors sometimes require the services of a traffic control company, like AWP. *Id.* The general foreman overseeing the job, whether employed by LG&E or by an electrical contractor hired by LG&E, typically selects the traffic control company used for a particular job. *Id.*; DN 95-4, PageID# 1237. LG&E compensates the traffic control company for these services. DN 106-11, PageID# 2211-13.

Former Employees B. Cox, Whited, Baker, DeCruz, Kirby, McLean, A. Cox, Persley, and Miller were employed by AWP as "protectors" (also referred to, variably, as "flaggers"); Glidewell worked as an Assistant Facility Manager. DN 95-2, PageID# 1183, 1185. All Former Employees seem to have been employed "at-will."[1] All Former Employees signed a confidentiality, non-competition, and non-solicitation agreement (the "Employment Agreement"), either upon accepting employment with AWP or as a condition of accepting a promotion and increased wages

---

[1] That all Former Employees were employed "at-will" is not explicitly stated in the briefing, but neither party has evidenced or argued that the employees were hired under contract.

with AWP. DN 54, PageID# 707.[2] The following provisions of the Employment Agreement are relevant to the case at bar:

> (b)   <u>Confidentiality</u>. Employee agrees not to, at any time, either during the Term or thereafter, divulge, use publish or in any other manner reveal, directly or indirectly, to any person, firm, corporation or any other form of business organization or arrangement and keep in the strictest confidence any Confidential Information, except (i) as may be necessary for the Employee's duties for AWP, (ii) with AWP's express written consent, (iii) to the extent that any such information is in or becomes in the public domain as the result of Employee's breach of any the obligations hereunder, or (iv) where required to be disclosed by court order, subpoena or other government process and in such event, Employee shall cooperate with AWP in attempting to keep such information confidential. Upon the request of AWP, Employee agrees to promptly deliver to AWP the originals and all copies, in whatever medium, of all such Confidential Information in Employee's possession or control.

> (c)   <u>Non-Compete</u>.  Employee covenants and agrees that during Employee's employment and for a period of twelve (12) months following the conclusion of Employee's employment for whatever reason, or following the date of cessation of the last violation of this Employment Agreement, or from the date of entry by a court of competent jurisdiction of a final, unappealable judgment enforcing this covenant, whichever of the foregoing is the last to occur (the "Restricted Period"), Employee will not, as principal, or in conjunction with any other person, firm , partnership, corporation or other form of business organization or arrangement (whether as a shareholder, partner, member, principal, agent, lender, director, officer, manager, trustee, representative, employee or consultant), directly or indirectly, be employed by, provide services to, in any way be connected, associated or have any interest of any kind in, or give advice or consultation to any Competitive Business within a 120-mile driving distance from Employer's regularly assigned place of duty or office.

> (d)   <u>Non-Solicitation of Employees</u>. Employee covenants and agrees that, during the Restricted Period, Employee shall not, without the prior written permission of AWP, directly or indirectly (i) solicit, employ or retain, or have or deliberately cause any other

---

[2] Bartley was also formerly employed as a Facility Manager for AWP before going to work for Safe Zone, but she did not sign the Employment Agreement and, hence, is not subject the breach of contract claim. DN 95-2, PageID# 1185.

person or entity to solicit, employ or retain, any person who is employed or is providing services to AWP at the time of Employee's termination of employment or was or is providing such services within the twelve (12) month period before or after Employee's termination of employment or (ii) request, suggest or deliberately cause any employee of AWP to breach or threaten to breach term of said employee's Employment Agreements with AWP or to terminate his or her employment with AWP.

(e)     <u>Non-Solicitation of Clients and Customers</u>. Employee covenants and agrees that, during the Restricted Period, Employee will not, as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement (whether as a shareholder, partner, member, principal, agent, lender, director, officer, manager, trustee, representative, employee or consultant), directly or indirectly: (i) solicit or accept any business in competition with AWP, from any person or entity who was an existing or prospective customer or client of AWP at the time of, or at the time during the twelve (12) months preceding, Employee's termination of employment; or (ii) request, suggest or deliberately cause any of AWP's clients or customers to cancel, reduce, change the terms of or terminate any business relationship with AWP involving services or activities which were directly or indirectly the responsibility of Employee during Employee's employment.

Employment Agreement, DN 95-3, PageID# 1220-22. AWP defines a "Competitive Business" as "any business which competes, directly or indirectly, with any aspect of AWP's business of providing traffic control services and equipment." DN 95-3, PageID# 1219.

United Electric is "an electrical contractor that performs work for utilities in the Louisville area," including for LG&E and Kentucky Utilities ("KU") (LG&E and KU are collectively known as "PPL Corporation" or "PPL"). DN 95-2, PageID# 1180, 1193. Until mid-2019, United Electric relied on crews of protectors employed by AWP to control and direct vehicle traffic around jobsites while United Electric electricians performed electrical work for PPL. *Id.*, PageID# 1180. In August 2019, United Electric formed its own company, Safe Zone, to perform the traffic control services

and began providing its own protectors to worksites when United Electric carried out jobs for PPL. *Id.*

Defendant Hatcher is the president of Safe Zone and the vice president of utility division of United Electric. Hatcher Depo., DN 95-4, PageID# 1228-29. Hatcher alleges that he came up with the idea for creating Safe Zone after AWP protector crews became less and less reliable and that he proposed his idea to Defendant Walsh, president of United Electric, in early 2019. *Id.*, PageID# 1231. In May 2019, Hatcher shared his business proposal with LGE, and Safe Zone began providing protector crews to PPL jobsites in August 2019. *Id.*, PageID# 1231-33.

At some point, Safe Zone began recruiting AWP employees to work for Safe Zone. *See, e.g.*, Miller Statement, DN 96-10 (indicating that Defendant Miller had been contacted by Hatcher about possibly working for Safe Zone). In July 2019, AWP learned of this recruitment and sent a letter to Walsh, informing him that all AWP employees were bound by the Employment Agreement[3] and that AWP would enforce this Employment Agreement against all breaching employees. AWP Letter, DN 96-11. Walsh shared this letter with Hatcher. DN 96-1, PageID# 1640. Nonetheless, by October 2019, all Former Employees had been hired by Safe Zone. *Id.*, PageID# 1641.

II. *Procedural Posture*

On October 10, 2019, Plaintiff filed a complaint in the Western District of Kentucky, enumerating ten counts against Defendants. DN 1, PageID# 20–29.[4] AWP filed a first amended complaint on December 8, 2020, adding several defendants and enumerating the following Counts:

---

[3] AWP has otherwise indicated that, of the twenty-eight AWP employees hired by Safe Zone, only sixteen were actually bound by the Employment Agreement. DN 106, PageID# 2010.

[4] Count Seven was dismissed on April 17, 2020 (DN 26) and Brian Skaggs was dismissed as a defendant on May 14, 2020 (DN 33).

| Count | Allegation | Defendants |
|---|---|---|
| Count One | Breach of Contract | Virginia Glidewell, David Miller, Amber Cheeks, Tony Whited, Jamaizz Baker, Mary DeCruz, George Kirby, Tikesha McLean, Anthony Cox, Laquana Persley, Herman White, Sebastian Williams, Cherise Dye, Bruce Cox, Larry Cummings, and Ciara Simcoe[5] |
| Count Two | Tortious Interference with Contract | United Electric, Safe Zone, Daniel Walsh, Mark Hatcher, Samantha Bartley, Virginia Glidewell, George Kirby, Tony Whited, and David Miller |
| Count Three | Tortious Interference with Business Relationships | All Defendants |
| Count Four | Misappropriation of Trade Secrets - Ky. Rev. Stat. Ann. § 365.880, et. seq. | All Defendants |
| Count Five | Breach of Fiduciary Duty and Duty of Loyalty | George Kirby, David Miller, Amber Cheeks, and Tikesha McLean |
| Count Six | Unfair Competition | Safe Zone |
| Count Seven | Civil Conspiracy | All Defendants |
| Count Eight | Accounting | All Defendants |
| Count Nine | Preliminary and Permanent Injunction | All Defendants |
| Count Ten | Punitive Damages | All Defendants |

DN 54, PageID# 727.

On August 13, 2021, Defendants filed a joint motion to exclude the expert report and testimony of Sam Myers and also a joint motion for summary judgment on all remaining claims.[6] DNs 94 and 95. That same day, AWP filed a motion for partial summary judgment on Counts One against Former Employees and Count Two against Safe Zone. DN 96. On August 14, 2021 and September 25, 2021, AWP filed motions for leave to seal documents. DNs 97 and 107. The Court will now address each of these motions.

III.    *Legal Standard for Summary Judgment*

---

[5] There is no indication in the docket for this case that Defendants Herman White, Sebastian Williams, Cherise Dye, Larry Cummings, or Ciara Simcoe received service of process.
[6] Defendant Cheeks did not join these motions.

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

IV.     *Causation and Damages*

In this action, AWP seeks to recover "lost profit damages and disgorgement of profit damages as a result of defendants' unlawful conduct." DN 106-4, PageID# 2140. According to AWP, "the amount of these damages will be calculated off the amount of Safe Zone Service, LLC's ("Safe Zone") profits or gains that were obtained unlawfully." *Id.* AWP alleges that Defendants "caused AWP to lose profits on the work the [Former Employees] directly performed for Safe Zone, because regardless of any other factors, Safe Zone could not have diverted that work from AWP without the [Former Employees] violating their Employment Agreements." DN 106, PageID# 2039. Specifically, AWP claims that it "had the capacity to employ [Former Employees] and to put them to work for PPL, but as a result of not being able to put the former employees to work for PPL, . . . AWP lost out on the profits that it would have realized on that PPL work and that was, instead, realized by Safe Zone." DN 105, PageID# 1951.

AWP's damages expert, Sam Myers ("Myers"), calculated the alleged lost profits by first projecting the profit AWP expected to realize from the work performed for PPL based on the "the historical revenue AWP realized from PPL in Louisville in the two years prior." Myers Expert Disclosure, DN 105-3, PageID# 2004-05. Myers compared this projected profit to the profit that was actually realized by the work AWP performed for PPL during the timeframe in question, then decreased this total loss "to the proportion of Safe Zone work performed directly by former AWP employees in the field." *Id.* The parties dispute the admissibility of Myers' report and testimony and Defendants have, thus, moved to exclude this evidence. DN 94.[7]

The underlying assumption behind the lost profit calculations is that the level of work that AWP performed for PPL would continue to follow the same trend that it had since AWP began

---

[7] For purposes of this motion, the Court assumes that the expert report and testimony would be offered at trial. However, in light of the deficiencies regarding the damages calculations as noted in this opinion, the Court need not rule on the admissibility issues raised by Defendants. Accordingly, the motion to exclude Myers' expert disclosure and testimony will be denied as moot.

offering traffic control services in the third quarter of 2017. DN 105, PageID# 1950. However, this assumption is belied by AWP's own arguments. AWP urges that its "customers are generally free to change traffic control companies" and, throughout the briefing, AWP repeatedly acknowledges—emphasizes, in fact—the importance of establishing a good rapport with the electrical foremen who oversee jobs for PPL in order to continue to be chosen for PPL jobs in the future. DN 106, PageID# 2024, 2030. According to AWP:

> Customers do not generally enter into exclusive contracts in the traffic control industry and, therefore, AWP's customers select traffic control providers largely on the strength of their relationships with the employees performing their traffic control work. AWP's customers hire foremen to oversee their roadside jobsites and these foremen are responsible for selecting the company that provides traffic control services at their jobsite. Accordingly, the protectors' relationships with the foremen are crucial for continuing and developing goodwill AWP has developed with its customers.

DN 96-1, PageID# 1635. Therefore, based on AWP's own description, regardless of any contract that it might have with PPL, there was absolutely no guarantee that AWP would continue to be selected for any future work at PPL jobsites.

There is evidence that the relationship between United Electric and AWP was beginning to degrade prior to Safe Zone's formation in 2019. Mark Hatcher, Vice President of United Electric, testified that prior to establishing Safe Zone, United Electric exclusively used AWP for traffic control services, but that in 2018 United Electric suffered financial losses because of AWP flagging crews not showing up for jobs. DN 95-4, PageID# 1231. To circumvent these difficulties, Hatcher proposed to PPL his idea for United Electric to start its own traffic control company early in 2019. *Id.*, PageID# 1231-32.

While AWP refutes the assertion that its relationship with United Electric was injured prior to Safe Zone's formation in 2019, AWP has simply failed to provide evidence that, but for the

formation of Safe Zone and the hiring away of AWP's workers, AWP would have been entitled to a certain level of profit from work it performed at PPL jobsites. AWP's mere assertion that, if truly unhappy with AWP's service, United Electric could have used the services of another traffic control provider does not rebut Hatcher's testimony that United Electric was dissatisfied with AWP's service. Most importantly, however, is the fact that United Electric was free to form its own traffic control company, regardless of whether United Electric was actually dissatisfied with AWP's service.

At best, AWP's "significant" loss in the business it received from PPL after Safe Zone hired Former Employees[8] shows that Safe Zone took business away from AWP. However, because AWP had no exclusive contract with PPL or any of the electrical contractors PPL hired, there was nothing untoward about Safe Zone soliciting its services to PPL and competing with AWP for this work. And, there is no evidence that AWP would not have experienced this loss in business no matter who Safe Zone hired as workers. The fact that a new competitor entered the market is a sufficient reason for AWP to experience a "significant" drop in business.

In sum, in an industry where service providers are selected on a job-by-job basis, evidence of being chosen for work in the past establishes nothing about the likelihood of being chosen for such work in the future. AWP has admitted as much by stressing the importance of establishing and maintaining a good rapport with electrical foremen in order to continue being selected for PPL jobs. As such, AWP is faced with two problems. First, AWP cannot establish a causal connection between Defendants' purported misconduct and its alleged loss in profits. Second, and consequently, the lost profit damages that AWP seeks based on the work that AWP alleges Safe Zone "diverted" away from AWP is purely speculative. The reality is, there is simply no way to

---

[8] DN 106, PageID# 2023.

know how much of this work would have gone to AWP had Safe Zone not hired AWP's workers or had it not been established as a competing business at all.

AWP is also "pursuing damages for the expenses it incurred in hiring and training employees to replace the former AWP employees that were hired by Safe Zone in the amount of $1,240 per former employee, which is comprised of an average, per employee expenditure of $169 for recruiting, $76 for onboarding, $538 for training expenses, and $457 for an employee's payroll costs during training." DN 106-4, PageID# 2140. AWP has offered no evidence of these damages, as the expert report submitted by Sam Myers only addresses AWP's alleged lost profits. *See* DN 94-5, PageID# 1117. Further, based on the analysis below, AWP has articulated no theory under which it could recover these damages.

For these reasons and the reasons that follow, Defendants' motion for summary judgment on all claims will be granted.

V.   *Breach of Contract Claim*

A.   *Noncompete Provision*

AWP alleges that Former Employees "breached and continue to breach their obligations under the Employment Agreements." DN 54, PageID# 721. Specifically, AWP argues that "[t]here is no genuine dispute that Employment Agreements between AWP and the [Former] Employees existed and that the [Former] Employees breached those contracts by working for AWP's direct competitor within a 120-mile radius of AWP's Louisville office." DN 96-1, PageID# 1650.

The Employment Agreement contains a choice of law provision that states, "This Agreement shall be governed, construed, performed, and enforced in accordance with its express terms and otherwise in accordance with the laws of the State of Ohio, without reference to principles of conflict of laws." DN 95-3, PageID# 1222. "It is a well-accepted principle that a

11

federal court in a diversity case must apply the conflict of law rules of the state in which it sits." *Banek, Inc. v. Yogurt Ventures U.S.A.*, 6 F.3d 357, 361 (6th Cir. 1993) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)). While the parties to the present case agree that Kentucky conflict-of-law analysis is the proper framework for determining whether the Employment Agreement should be evaluated under Kentucky or Ohio law, each party reaches a different conclusion as to the outcome of this analysis. The Court need not decide on this issue, as the outcome is the same under Kentucky or Ohio law.

For a breach of contract claim to be actionable in Kentucky or Ohio, the plaintiff must first evidence the existence of a valid contract between the parties. *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. Ct. App. 2007); *Garofalo v. Chi. Title Ins. Co.*, 104 Ohio App. 3d 95, 108, 661 N.E.2d 218, 226 (1995) (citations omitted). In addition to the deficiencies already discussed regarding causation and damages, the Court finds that the noncompete provision of the Employment Agreement is unenforceable and, hence, AWP has failed to evidence an essential element of its breach of contract claim.

Courts in both Ohio and Kentucky look to the reasonableness of a noncompetition agreement to determine whether the agreement is enforceable. *See Advanced Sols., Inc. v. Chamberlin*, No. 07-612-C, 2007 U.S. Dist. LEXIS 87887, at *12 (W.D. Ky. Nov. 27, 2007) ("[I]n Kentucky, ancillary covenants such as a covenant not to compete are valid and enforceable if the terms are reasonable in light of the surrounding circumstances.") (citations and internal punctuation omitted); *P&G v. Stoneham*, 140 Ohio App. 3d 260, 270, 747 N.E.2d 268, 275 (2000) ("In Ohio, non-compete agreements that are reasonable are enforced.") (citation omitted). The parties dispute the reasonableness of the noncompete provision of the Employment Agreement.

The assessment of "reasonableness" is very similar under the laws of both states and takes into consideration the interests of the employer, the hardship on the employee, and the interests of the public. *See Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978) ("[I]t has been held in Kentucky that an agreement in restraint of trade is reasonable if, on consideration of the subject, nature of the business, situation of the parties and circumstances of the particular case, the restriction is such only as to afford fair protection to the interests of the covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted.") (citing *Ceresia v. Mitchell*, Ky., 242 S.W.2d 359 (1951)); *Try Hours, Inc. v. Douville*, 985 N.E.2d 955, 961 (Ohio Ct. App. 2013) ("Under Ohio law, a covenant not to compete is reasonable if the restraint: '(1) is required to protect the legitimate interest of the employer, (2) does not impose an undue hardship on the employee, and (3) is not injurious to the public.'") (citations and quotations omitted).

   *1. Reasonableness*

   It is worth noting at the outset that the majority of the cases reviewed by this Court in which Kentucky or Ohio law was applied, including those cases cited by the parties, address the enforceability of noncompete agreements against skilled workers,[9] salespersons,[10] employees in management or other positions with access to sensitive materials,[11] or workers who departed from

---

[9] *Convergys Corp. v. Wellman*, 2007 U.S. Dist. LEXIS 90729, at *15-*26 (S.D. Ohio 2007) (applying Ohio law to analysis of noncompete agreement enforceability against a former director of human resources)

[10] *Church Mut. Ins. Co. v. Von Smith & Claude Reynolds Ins. Agency*, 2014 U.S. Dist. LEXIS 204490, at *11-*12, *17-*21 (W.D. Ky. 2014) (applying Kentucky law to assess enforceability of a covenant not to compete against a former insurance sales representative and his new employer); *Charles T. Creech Inc. v. Brown*, No. 2011-CA-000629-MR, 2012 Ky. App. Unpub. LEXIS 1033, at *10-*20 (Ct. App. Aug. 17, 2012) (addressing enforcement of noncompete agreement against former salesman), rev'd on other grounds, 433 S.W.3d 345, 354 (Ky. 2014); *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 147 Ohio App. 3d 382, 770 N.E.2d 1068, 1079-1081 (10th Dist. 2001) (claiming tortious interference with contract against a company that hired former salespeople who were bound by a covenant not to compete).

[11] *Lantech.com, LLC v. Yarbrough*, 247 Fed. Appx. 769, 773-74 (6th Cir. 2007) (reviewing lower court's application of Kentucky to determine enforceability of noncompete agreement against a former regional sales manager); *Union Home Mortg. Corp. v. Payne*, 2020 U.S. Dist. LEXIS 132097, at *19-*27 (applying Ohio law to assess whether a covenant not to compete was enforceable against a former loan officer with access to confidential and proprietary

their previous employer to establish a directly-competing enterprise.[12] Indeed, the Court has had

to search far and wide to find examples of employers attempting to enforce covenants not to

compete against low-skilled, at-will employees with no established customer base and no access

to proprietary information, such as, for example, profit data. The few cases that were found favor

the employees.[13]

Turning to the case at bar, the Court finds the noncompete provision of the Employment

Agreement to be facially unreasonable, as the language of the provision is grossly overbroad. Not

only does it bar a former employee from accepting the same or similar position with a competing

company, but it prohibits the employee from accepting any employment in any capacity

---

information); *Vencor, Inc. v. Webb*, 33 F.3d 840, 845-46 (7th Cir. 1994) (applying Kentucky law to determine if noncompete agreement was enforceable against a former assistant administrator of finance with access to financial documents and other sensitive materials).

[12] *Rogers v. Runfola*, 565 N.E.2d 540, 541 (Ohio 1991) (determining enforceability of covenant not to compete against two former employees who planned to open a competing firm); *Central Adjustment Bureau, Inc. v. Ingram Associates, Inc.*, 622 S.W.2d 681, 683 (Ky. 1981) (addressing enforcement of noncompete agreement against employees who "made plans and took actions prior to their resignation to acquire a proprietary interest in a collection business which was intended to operate in direct competition with" the plaintiff's enterprise); *Hammons v. Big Sandy Claims Service, Inc.*, 567 S.W.2d 313, 314-15 (Ky. App. 1978) (assessing enforceability of a noncompete provision against a former employee who opened a competing claims service).

[13] *See, e.g.*, *Ecology Servs., Inc. v. Clym Envtl. Servs., LLC*, 952 A.2d 999, 1004-05 (Md. App. 2008) (upholding a lower court's finding that appellees were "clearly low-level employees" who delivered packages, and were not utilizing skills against whom covenants not to compete could be enforced); *Moda Hair Designs, Inc. v. Dechert*, 2006-Ohio-682, ¶¶ 22-26 (Ct. App.) (upholding the lower court's decision that a noncompete agreement was unenforceable against the defendant hairdresser, even though the defendant had received "some on-the-job training" and had access to client information); *Elite Cleaning Co. v. Capel*, Civil Action No. 690-N, 2006 Del. Ch. LEXIS 105, at *26-*27 (Ch. June 2, 2006) (finding the employer's stated interest in enforcing a noncompete agreement against a janitor to be "very weak," as the janitor did "not possess a high level of skill," "work[ed] for only slightly more than minimum wage and receive[d] no benefits," and did not have access to confidential or proprietary information); *Nat'l Employment Serv. Corp. v. Olsten Staffing Serv., Inc.*, 761 A.2d 401, 405 (N.H. 2000) (refusing to enforce a noncompetition agreement for light industrial laborers who were not in a position to appropriate the company's goodwill and were without access to sensitive information); *Narragansett Coated Paper Corp. v. Lapierre*, C.A. No. PC 97-2842, 1998 R.I. Super. LEXIS 75, at *6 (Super. Ct. June 25, 1998) (stating "the plaintiff has failed to prove that the drastic relief it seeks is reasonably necessary to protect the confidentiality of its unique products and processes," despite showing that the defendant, a quality control technician, had knowledge of these "products and processes"); *Accent Stripe v. Taylor*, 612 N.Y.S.2d 533, 534 (App. Div. 1994) (finding a restrictive covenant not to compete to be unenforceable because "[d]efendant's position as an epoxy rig operator is not highly compensated and requires no unique skills or specialized training. Defendant thus is not a 'unique' or 'irreplaceable' employee whose departure caused plaintiff special harm. Similarly, defendant was not shown to have knowledge of trade secrets or to have threatened disclosure of such secrets to his new employer to plaintiff's disadvantage.") (internal citation omitted); *Becker v. Bailey*, 299 A.2d 835, 839 (Md. 1973) (refusing to enforce a covenant not to compete against an "unskilled worker whose services are not unique," as he "learned no trade secrets nor did he engage in solicitation of any . . . customers").

whatsoever with a "Competitive Business." DN 95-3, PageID# 1220. AWP's definition of a "Competitive Business" includes "any business which competes, directly or indirectly, with any aspect of AWP's business of providing traffic control services and equipment." DN 95-3, PageID# 1219. The provision does not allow the employee to "provide services to, in any way be connected, associated or have any interest of any kind in" a "Competitive Business." *Id.* This type overreaching language smacks of a desire to lock workers into their present employment rather than to protect AWP's purported competitive interests.

The provision is also unreasonable as applied to the circumstances of this case because of its unnecessarily restrictive geographic constraint. Despite there being evidence in the record that AWP protectors would only work within sixty miles of the Louisville office,[14] the noncompete provision in the Employee Agreement prohibits an employee who worked as a protector with AWP from working for any competitor "within a 120-mile driving distance from Employer's regularly assigned place of duty or office." DN 95-3, PageID# 1220.

Enforcement of this restrictive covenant would function to stifle ordinary competition, not just competition that is "unfair." In essence, it bars a Former Employee from being employed by any company that also works in the same field as AWP within 120 miles of AWP's Louisville office, regardless of whether that company is an actual competitor or whether the employee's role with the competitor is similar to the role the employee held with AWP. *See Medix Staffing Sols., Inc. v. Dumrauf*, No. 17 C 6648, 2018 U.S. Dist. LEXIS 64813, at \*6-7 (N.D. Ill. Apr. 17, 2018) (declining to enforce a covenant not compete that barred the employee from "'directly or indirectly, own[ing], manag[ing], operat[ing], control[ing], be[ing] employed by, participat[ing] in or be[ing] connected in any manner with the ownership, management, operation or control of,'

---

[14] DN 95-12, PageID# 1415.

15

any company in actual competition with [the employer] or any company directly or indirectly engaged in the Business of [the employer]"). The inequities that would result if this provision was enforced would be intolerable under Kentucky or Ohio law. *See Charles T. Creech Inc. v. Brown*, No. 2011-CA-000629-MR, 2012 Ky. App. Unpub. LEXIS 1033, at *17-*18 (Ct. App. Aug. 17, 2012) (stressing the importance that a noncompetition agreement be "narrowly tailored"), rev'd on other grounds, 433 S.W.3d 345, 354 (Ky. 2014); *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 25, 325 N.E.2d 544, 547 (1975) (indicating that the reasonableness assessment includes considering the limitations on "ordinary" competition).

   2. *AWP's Purported Legitimate Business Interests*

AWP maintains that it has legitimate business interests in "preventing the disclosure of its Confidential Information, maintaining its substantial relationships with customers and prospective customers, and preserving the substantial amount of time, labor and expenses invested in its employees." DN 54, PageID# 707. The Court can quickly dispose of the first argument. Insofar as any Former Employees, including Glidewell, had access to sensitive information, the fact that the Employee Agreement contains a separate nondisclosure provision forecloses any argument that AWP needed a noncompete agreement to protect it.

Turning to AWP's alleged interest in protecting customer relationships, the Court recognizes that "[t]he policy behind enforcing noncompetition clauses is to protect businesses against employees resigning and taking valued clients with them." *Managed Health Care Assocs. v. Kethan*, 209 F.3d 923, 929 (6th Cir. 2000) (citing *Central Adjustment Bureau, Inc. v. Ingram Associates*, 622 S.W.2d 681, 685-86 (Ky. Ct. App. 1981)). However, except for *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F.Supp. 495, 502 (E.D. Ky. 1996), the cases AWP relies on all involve employees who established or planned to establish competing

enterprises,[15] had sales positions,[16] or had positions that heavily relied on the development of strong personal relationships with customers.[17] Unlike these employees, Former Employees did not have a "book of business" or client list that they could bring with them from their former employer. They were not responsible for "bringing in new clients and business" and, other than potentially Glidewell, they did not have access to "customer and sales information." DN 95-12, PageID# 1399-1400.

AWP makes much of the fact that, in the traffic control industry, an electrical foreman often requests the same traffic control crew because sometimes the foreman and the crew "hit it off" and claims that it relied on its assistant facility managers "to develop relationships with customers and to foster goodwill by ensuring all customers [sic] service issues are addressed." DN 96-1, PageID# 1647 (quoting Hatcher Depo., DN 96-12, PageID# 1789); DN 106, PageID# 2013 (citing Asst. Facility Manager Job Description, DN 96-4). However, the Court cannot help but notice that the lack of detail provided on this issue sits in stark contrast to the type of information provided to the court in another case in which the court upheld a noncompete agreement against an AWP employee. In *AWP, Inc. v. Henry*, AWP raised the protection of customer relationships as a legitimate business interest when it sued former Project Manager Kent Puckett ("Puckett") for violation of his covenant not to compete. 522 F. Supp. 3d 1294, 1300 (N.D. Ga. 2020). According to AWP, Puckett was "expected to solicit business for AWP by building relationships with customers and the foremen they employed." *Id.* He "regularly met with customers and the foremen

---

[15] *Central Adjustment Bureau v. Ingram Assoc. Inc.*, 622 S.W.2d 681, 683 (Ky. Ct. App. 1981).

[16] *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 147 Ohio App. 3d 382, 770 N.E.2d 1068, 1079-1081 (10th Dist. 2001); *Miller Med. Sales v. Worstell*, 10th Dist. Franklin No. 91AP-610, 1992 Ohio App. LEXIS 779, at *6-*7 (Feb. 18, 1992).

[17] *Charles Penzone, Inc. v. Koster*, 10th Dist. Franklin No. 07AP-569, 2008-Ohio-327, ¶¶ 22-23.

17

they employed to plan future projects and discuss ongoing projects" and he "routinely solicited AWP customers and routinely obtained new orders from AWP customers." *Id.* at 1301.

There is no evidence that any of Former Employees took part in these types of activities. In fact, besides AWP's broad assertions that protectors are the "face of the company" and "the protectors' relationships with the foremen [of the electrical contractors working for LG&E] are crucial for continuing and developing the goodwill AWP has developed with its customers,"[18] there is little in the record showing that AWP relied on Former Employees to do more than any employer would expect of employees who interact with customers—to treat customers with respect and to deliver quality customer service. This does not give rise to a protectable interest.

With all other arguments put forth by AWP set aside, the only apparent basis for this Court to enforce the noncompete provision against Former Employees who worked as protectors is AWP's purported interest in the training that these employees received. AWP argues that it "invests significant amounts of time, effort and money into training it flaggers to become effective traffic control professionals" and argues that, as a "middleman," it needs to be able to prevent third parties from "unfairly capitalizing on" its investments. DN 106, PageID# 2015, 2029-30.

The Court first notes that it is not aware of any Ohio or Kentucky case that cites to this "middleman" or "disintermediation" theory for limiting the competition of former employees. Even if such an interest is recognized in these states, it is not clear that AWP occupied a "middleman" position in the traffic control industry. The facts of the case at bar do not align with those in *Borg-Warner* or the case that the court in *Borg-Warner* cites for being "highly persuasive" in its characterization of "disintermediation." 946 F.Supp. at 502 (citing *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553 (11th Cir. 1983)).

---

[18] Wachter Dec., DN 96-2, PageID# 1659.

In *Consultants & Designers, Inc.*, the employer seeking to enforce a non-compete agreement, Butler Service Group, Inc. ("Butler"), was a firm in the "technical service industry." 720 F.2d at 1555. Essentially, Butler operated as an employment agency that recruited "highly skilled, relatively mobile technically trained workers" and helped to place these "job shoppers" with client firms that were seeking "short-term, highly skilled technical workers." *Id.* "Butler's role was to gather, distill, and provide to [client firms] information on available and suitable people for [the firm's] positions and simultaneously to provide to prospective job shoppers information about [the firm] and the positions it was offering." *Id.* at 1558. In return, Butler "earn[ed] its income by charging the client firm a price per employee per pay period which exceeds what [Butler] must in turn pay the employee." *Id.* at 1555. Because of Butler's intermediary role in this arrangement, the Eleventh Circuit found that Butler had a legitimate business interest in preventing the "direct solicitation, negotiation and contracting between the firm and the worker" and referred to this interest as protection against "[e]liminating the middleman." *Id.* at 1558.

Like Butler, the employer in *Borg-Warner*, Guardsmark, was hired by a client to advertise, recruit, and eventually hire workers specifically to work at one of the client's facilities. 946 F.Supp. at 496. Guardsmark provided these employees, hired as security guards, with eighty hours of on-the-job client-specific training. *Id.* at 496-97. Later, another security firm, Borg-Warner, won the contract with Guardsmark's client and sought to hire the Guardsmark employees who had already been trained and were working at the client's facility. *Id.* at 497. The court held that a noncompete agreement between the employees and Guardsmark was enforceable to protect Guardsmark's

investment of "time, effort and money" in training the workers specifically for employment at the client's facility. *Id.* at 496-97, 502.[19, 20]

The Court finds AWP's comparison of its situation to that of Butler or Guardsmark to be inapposite. AWP hired individuals to work as protectors and provided them with some relevant training. AWP then competed with similar companies for opportunities to provide services to customers that required traffic control crews, such as PPL and the electrical contractors it hired. There is no evidence that AWP recruited, hired, or trained workers specifically at the request of its customers and the bulk of the training AWP provided its employees was not client specific. Accordingly, it is unfitting to consider AWP to be an intermediary between its customers and its workers. For these reasons, *Borg-Warner* and the cases cited therein[21] are not persuasive.

Regarding AWP's training-related financial expenditures, AWP maintains that, "[w]ith the exception of a thirty-dollar expense charged to the newly hired protectors for training materials, AWP trained these protectors at its own expense." DN 96-2, PageID# 1660. In addition, AWP claims that during the first week of a protector's training, it paid the protector's "full wages" "without any charge to customer."*Id.* AWP reports a cost of $538 per employee for training expenses and $457 per employee for the employee's wages during the first week of training. DN 106-4, PageID# 2140.

---

[19] The court in *Borg-Warner* held that the noncompete agreement was valid under either Tennessee or Kentucky law, and, thus, did not engage in a choice-of-law analysis. 946 F. Supp. at 500.

[20] Of note, the court in *Borg-Warner* stated that it was "a relatively common practice in the security guard industry" for an employer to hire security guards from another firm knowing that the employees were under noncompete agreements and promising to "represent [the employees] in the event that [the former employer] attempted to enforce its non-compete clauses." 946 F.Supp. at 497.

[21] In both Kentucky cases cited within *Borg-Warner*, the defendant employees had established or were intending to establish enterprises that directly competed, in close geographic proximity, with the former employer and, thus, the employer had a reasonable concern about losing clients. *Hammons v. Big Sandy Claims Service, Inc.*, 567 S.W.2d 313, 314 (Ky. Ct. App. 1978); *Central Adjustment Bureau v. Ingram Assoc. Inc.*, 622 S.W.2d 681, 683 (Ky. Ct. App. 1981).

With respect to AWP's purported investment of "time and effort," AWP reports that, during his or her the first week of work, a protector receives about eight hours of classroom instruction and then "shadows" a more senior employee for three days. DN 95-12, PageID# 1385-86, 1387-89. After the first week, there are other opportunities for protectors to receive training as they progress (identified as "TCT," "TCS," "TMA," and "Smith driver" training). DN 95-12, PageID# 1390. Most Former Employees who worked as protectors received thirty hours or less of training in total, including the training from the first week. DN 96-9. It appears that most of these employees completed the Smith driver training and the employees with the most training—Whited and DeCruz—completed some of the other optional training courses. *Id.*, PageID# 1747-1777. Five Former Employees received two hours of "customer specific" training. *Id.*, PageID# 1750, 1753, 1760, 1763, 1766 (denoted as "KU Passport Training").[22]

AWP puts much emphasis on the fact that it incorporates "customized" instruction materials into its training curriculum rather than just exclusively using "off-the-shelf" training materials. DN 106, PageID# 2015. Yet, according to the testimony of Partin, "AWP's Facility Manager and Trainer for its Louisville and Lexington locations" (DN 95-2, PageID# 1178), these "customized" materials are utilized for "three or four hours" on the first day of instruction, while the remaining "four to five hours" of that day is spent using "generic" or "off-the-shelf" training materials. DN 95-12, PageID# 1387. Partin also indicated that AWP used "standard off-the-shelf" materials for the TCT, TCS, TMA, and Smith driver training courses. DN 95-12, PageID# 1390.

In sum, though AWP has shown that it has made some investment of "time, effort and money" in training its employees, whether this investment is "significant" enough to constitute a "legitimate business interest" is questionable at best.

---

[22] This distinguishes the instant case from Borg-Warner, where the employees received eighty hours of "specialized" training. 946 F. Supp. at 496.

### 3.  Modification of Covenant

In any event, were the Court to find that AWP has shown that its investment in training Former Employees who worked as protectors[23] gave rise to a protectable interest, the aforementioned overbreadth of the noncompete provision still poses a problem to its enforcement. It is at this point in the analysis "where the trial court may modify certain provisions of the noncompetition agreement if doing so would not work an injustice upon the parties, if a modification would make the agreement reasonable, and if the court determines in its discretion that it is wise to do so." *Charles T. Creech Inc.*, 2012 Ky. App. Unpub. LEXIS 1033, at *19. *See also Kegel v. Tillotson*, 297 S.W.3d 908, 913 (Ky. Ct. App. 2009) (stating that Kentucky courts "have adopted a 'blue pencil' rule, whereby we are empowered to reform or amend restrictions in a non-compete clause if the initial restrictions are overly broad or burdensome"); *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 26, 325 N.E.2d 544, 547 (1975) ("A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such results.").

It is difficult for the Court to envision how AWP's asserted interest could be protected without imposing undue hardship on a group of low-wage earners.[24] Reining in the geographical constraint in the noncompete provision would not achieve this objective, as the provision would still unjustly encumber employment mobility by imposing sweeping restrictions on the type of

---

[23] AWP does not allege or argue that Glidewell received any training.

[24] AWP's briefing also does not offer the Court direction on this matter. Despite emphasizing the Court's ability "to reform or amend otherwise overbroad restrictions in non-compete agreements" (DN 96-1, PageID#1645), AWP does not discuss the scope or nature of the types of modifications that would preserve the protection of AWP's purported business interests.

work that Former Employees would be permitted to do. Ultimately, overcoming the defects of the agreement not to compete would require a wholesale rewriting. Notwithstanding any power to "blue pencil" overly broad noncompete agreements, it is not the responsibility or function of this Court to rewrite poorly drafted contracts *in toto*. As such, the Court declines to modify the noncompete provision to overcome the gross inequities that would result from its enforcement.

For all of the reasons cited above, the Court finds that, in addition to AWP's failure to provide evidence of causation and damages, AWP has not shown that a genuine issue of material fact exists as to the validity of the noncompete provision of the Employee Agreement. Therefore, Defendants are entitled to summary judgment on the breach of contract claim that is grounded in this provision.

### B.   Nonsolicitation Provision

AWP alleges that Glidewell also breached the Employment Agreement by soliciting an AWP employee Ciara Simcoe ("Simcoe") to work for Safe Zone. DN 96-1, PageID# 1650. Glidewell's employment with AWP was terminated on June 14, 2019. DN 98-3, PageID# 1862. Thus, assuming the nonsolicitation provision was valid, Glidewell was restricted until June 14, 2020 from soliciting any current AWP employee or an employee who has worked for AWP within the previous twelve months. DN 95-3, PageID# 1220-21.

As evidence of the alleged solicitation, AWP offers Simcoe's application for employment with Safe Zone, in which she indicates that she was "referred by" Glidewell. DN 96-18, PageID# 1832. The application is dated July 22, 2019, well-within Glidewell's "restricted period" under the nonsolicitation provision. *Id.* However, while Simcoe lists AWP as a "Former Employer," she also indicates that she is not presently employed and nowhere on the application is it stated that Simcoe

23

had worked for AWP within the past twelve months. *Id.* As such, the evidence in the record is insufficient to establish that Glidewell breached the agreement not to solicit.

For this reason and because AWP has failed to establish causation and damages, the Court finds that Glidewell is entitled to summary judgment on the claim that she breached the nonsolicitation provision of the Employment Agreement.

VI.     *Tortious Interference with Contract*

AWP alleges that Safe Zone committed tortious interference with a contract when it "brazenly hired each of the [Former] Employees despite knowing about the Employment Agreements, or in Glidewell's case, continuing to employ her despite learning about her Employment Agreement." DN 96-1, PageID# 1652. To substantiate such a claim in Kentucky, AWP must demonstrate: "1) that there was a valid contract, 2) that the defendant knew about the contract, 3) that the defendant intended that the contract be breached, and caused the breach, 4) that the defendant had no justifiable reason for interfering, and 5) that damages resulted." *FBK Partners, Inc. v. Thomas*, No. 09-292-GFVT, 2010 U.S. Dist. LEXIS 124579, at *21-22 (E.D. Ky. Nov. 23, 2010) (citing *NCAA v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988)).

Having determined that the noncompete provision of the Employment Agreement is unenforceable and that AWP has failed to substantiate the causation and damages elements of its claims, the Court finds that Defendants are entitled to summary judgment on this claim.

VII.    *Tortious Interference with Business Relationships*

In Kentucky, courts look to the Restatement of Torts § 766 for claims of tortious interference:[25]

> Tortious interference liability arises where a person, 'without privilege to do so, induces or otherwise purposely causes a third

---

[25] *Carmichael-Lynch-Nolan Adver. Agency, Inc. v. Bennett & Assocs., Inc.*, 561 S.W.2d 99, 102 (Ky. Ct. App. 1977).

person not to . . . enter into or continue a business relation with another,' thereby causing harm. Such liability is explicitly not predicated on the existence of a contract.

*Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009) (quoting Restatement (Second) of Torts § 766 (1979)). To prevail on such a claim in Kentucky, AWP must show: (1) a valid business relationship or its expectancy; (2) Safe Zone's awareness of this relationship or expectancy; (3) that Safe Zone intentionally interfered; (4) Safe Zone's improper motive; (5) causation; and (6) special damages." *Id.* (citing *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995)).

According to AWP, Defendants knew that AWP had a valid business relationship with PPL and, nonetheless, Defendants "interfered" with this relationship "by knowingly providing traffic control services to PPL and its contractors, including United Electric." DN 106, PageID# 2041. Further, AWP maintains that Defendants "acted with the requisite improper motive because each of them knew that by virtue of the Breaching Employees providing traffic control services to PPL, each of the Breaching Employees was in violation of his or her Employment Agreement." *Id.* Finally, AWP contends that Defendants' interference "caused AWP to suffer lost profits." *Id.*

AWP had been performing work for PPL for a number of years and, thus, the entities had working business relationship. Yet, by AWP's own admission, there was never any guarantee that PPL or its electrical contractors would to select AWP to provide traffic control services from one job to the next. Consequently, AWP cannot show that there was a reasonable likelihood that any business opportunity would have materialized absent Safe Zone's alleged misconduct. *See Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009) ("A valid business expectancy exists when there is 'a reasonable likelihood or a probability, not mere wishful thinking' that a business relationship will come about.") (quoting *Lucas v. Monro County*, 203

F.3d 964, 979 (6th Cir. 2000)). As such, it is not obvious that there was a business expectancy with which Safe Zone could have interfered.

Moreover, based on the framing of AWP's claim, AWP must evidence that Safe Zone was "improperly motivated" to "provide traffic control services to PPL and its contractors." DN 106, PageID# 2041. AWP attempts to make this showing by claiming that Safe Zone (and certain other Defendants) knew that each Former Employee that Safe Zone hired "was in violation of his or her Employment Agreement." *Id.* Putting aside the Court's doubts as to whether "knowingly providing traffic services" constitutes an "interference," AWP has not evidenced improper motive. In fact, simply "knowing" that Former Employees were bound by noncompete clauses does not equate to a "motive" at all. So far as the Court can tell, as a subsidiary of United Electric, Safe Zone's—and, more specifically, Hatcher's—"motive" in "providing traffic control services" was to ensure that traffic control crews showed up as scheduled for the jobs that United Electric performed for PPL and, thus, improve United Electric's financial position. That AWP suffered from a loss of business from United Electric does not show impropriety on the part of Safe Zone or any individual Defendant. AWP's argument is further undermined by the fact that the Court has found the noncompete agreement to be unenforceable against Former Employees.

Because AWP has failed to establish several essential elements of its claim of tortious interference with a business relationship, summary judgment for Defendants is warranted.

## VIII.   *Misappropriation of Trade Secrets*

AWP alleges that Defendants violated Kentucky's Uniform Trade Secrets Act (Ky. Rev. Stat. §§ 365.880-365.900, "KUTSA") by misappropriating AWP trade secrets in the "specialized and unique training materials" that it developed. DN 106, PageID# 2042. Although it is not entirely clear from the briefing, it appears that AWP's theory for misappropriation is that Safe Zone

incorporated "into [its] training program" the knowledge that Former Employees had about "trade secrets" in the AWP training materials. DN 106, PageID# 2042-43. For this conduct, AWP seeks compensatory and exemplary damages, as well as injunctive relief prohibiting further misappropriation. DN 54, PageID# 726.

Assuming, *arguendo*, that AWP has evidenced that its training materials include "trade secrets"—a fact that the Court is not convinced that AWP has established—AWP has not provided proof of misappropriation. Under KUTSA, "misappropriation" means:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>> 1. Used improper means to acquire knowledge of the trade secret; or
>> 2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>> a. Derived from or through a person who had utilized improper means to acquire it;
>>> b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>> c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>> 3. Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ky. Rev. Stat. § 365.880(3).

As AWP has offered no evidence that the information in the training materials was acquired through improper means, the only viable path that the Court sees for AWP to substantiate its claim of misappropriation requires AWP to show that one or more of Former Employees disclosed or used trade secrets from the training materials. AWP has offered no evidence that any Former Employee disclosed or used information from the training materials. Rather, AWP relies

completely on the trier of fact to infer that, because one or more of Former Employees now work as trainers for Safe Zone, trade secrets from the AWP training materials must have been disclosed and incorporated into the Safe Zone training program. *See* DN 106, PageID# 2043 ("the trier of fact could reasonably find that AWP's trade secrets were misappropriated into Safe Zone's training program without AWP's consent"). AWP provides no evidentiary basis for one to draw this inference and, as such, its arguments fall very short of the evidentiary standard required to survive summary judgment on this claim.[26]

IX.    *Breach of Fiduciary Duty*

AWP alleges that Kirby, Miller, Cheeks, and McLean breached their fiduciary duty[27] to AWP "by recruiting and soliciting AWP employees to terminate their employment with AWP and to accept employment with Safe Zone." DN 54, PageID# 727. "To prevail on a claim for breach of fiduciary duty under Kentucky law, a plaintiff must prove that (1) the defendant owed a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered damages as a result of the breach. *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 665 (E.D.Ky.2009) (citing *Sparks v. Re/Max Allstar Realty, Inc.*, 55 S.W.3d 343, 348 n. 15 (Ky.App.2000)). In Kentucky, a fiduciary duty is one "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an

---

[26] In addition, AWP has not specified the basis for the relief that it seeks for the alleged misappropriation. Under KUTSA, a complainant may recover damages for "the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Ky. Rev. Stat. § 365.884(1). Insofar as AWP attributes its alleged lost profits to this misappropriation, the Court has already addressed the general problems AWP faces with causation and damage calculations for this asserted injury. More specifically, there is no reason to conclude that any profits, let alone the entire amount claimed, were lost due to the supposed disclosure of information from the training materials. And, since AWP has not proven that any information from its training materials was actually disclosed or used by any Defendant, there is no activity for the Court to prohibit via an injunction.

[27] Although AWP asserts that Kirby, Miller, Cheeks, and McLean breached a "fiduciary duty" and a "duty of loyalty," because a "duty of loyalty" is a type of "fiduciary duty," *see Baptist Physicians Lexington, Inc. v. New Lexington Clinic*, P.S.C., 436 S.W.3d 189, 194 (Ky. 2013) (explaining the duties that can be described as "fiduciary"), the Court will refer to the alleged breach as a "breach of fiduciary duty."

28

undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). "[W]hen an employee, not a director or officer, is alleged to occupy a fiduciary status, the Court should consider the specific circumstances of his or her employment in determining whether he or she owed a fiduciary duty to the employer." *Miles Farm Supply, LLC v. Helena Chem. Co.*, 4:06-CV-23-R, 2008 WL 3010064, at \*20 (W.D. Ky. Aug. 1, 2008), aff'd, 595 F.3d 663 (6th Cir. 2010) (citation omitted).

A Kentucky court may find "a fiduciary relationship between an employer and employee when the employee has a 'position of trust, the freedom of decision, and access to confidential corporate information.'" *Cmty. Ties of Am., Inc. v. NDT Care Servs.*, LLC, No. 3:12-CV-00429-CRS, 2015 U.S. Dist. LEXIS 14990, at \*18-19 (W.D. Ky. Feb. 6, 2015) (quoting *Aero Drapery of Kentucky, Inc. v. Engdahl*, 507 S.W.2d 166, 168-69 (Ky. 1974)). AWP argues that all Former Employees, including Kirby, Miller, Cheeks, and McLean, owed a fiduciary duty to AWP because they had access to "confidential information," such as "training materials and service and business manuals," and that, as protectors, they were the "face of the company" to the public. DN 106, PageID# 2045. Assuming that Former Employees had access to information that AWP considered to be confidential, AWP must still show more, as "the theme running through our fiduciary-duty jurisprudence is that such access will not, alone, put an employee in a position of trust."[28] Thus, AWP's claim relies heavily on its assertion that, as protectors, Kirby, Miller, Cheeks, and McLean were the "face of the company" and that this, somehow, put these workers in a "position of trust" with "the freedom of decision."

---

[28] *Cmty. Ties of Am., Inc.*, 2015 U.S. Dist. LEXIS 14990, at \*3, \*21 (declining to impose fiduciary duties on an employee, despite the employee having access to "client files, employee files, and client lists, which were kept under "double lock and key") (citations omitted).

AWP's argument stems from a statement made in the deposition of Dan Gillen, AWP's Chief Human Resources Officer, in which he describes AWP's protectors as "the face of the company." DN 106-16, PageID# 2233. Neither AWP nor Gillen explain what is meant by this phrase, but AWP seems to lift the idea that an employee who acts as a "face of the company" owes fiduciary duties to his or her employer from *Miles Farm Supply, LLC v. Helena Chem. Company*, No. 4:06-CV-23-R, 2008 U.S. Dist. LEXIS 58430 (W.D. Ky. Aug. 1, 2008). In *Miles*, the court held that an employee owed fiduciary duties to his employer because, in addition to having "a considerable amount of responsibility and access to confidential information," "[h]e solicited new customers and therefore acted as a face of the company." *Id.* at *32-33.[29] This does not describe the position of the protectors who worked for AWP nor does it support any notion that AWP protectors were in a "position of trust" or had "freedom to decision."

AWP has also not evidenced that Kirby, Miller, Cheeks, and McLean breached any alleged fiduciary duty. AWP claims that these four employees "actively solicit[ed] AWP's employees to terminate their employment with AWP" and, as evidence, points to a text message exchange between Kirby and Hatcher, Safe Zone's president. DN 106, PageID# 2045. However, the text messages only show that Kirby provided Hatcher with a list of names of AWP workers who, Kirby claimed, wanted to "come work for Safe Zone services" and the phone numbers of these workers. DN 54, PageID# 714-15. Though the names of Miller, Cheeks, and McLean were included on this list, this does not show that these three employees "solicited" any AWP employees to "terminate their employment with AWP."

---

[29] In *Service Drywall Company v. Commonwealth Walls, Inc.*, the court imposed fiduciary duties on an employee who "referred to himself as the 'manager' of SDC's Louisville office" and was responsible for "selling the company," "providing estimates and bids for potential jobs," "for budgeting and billing the jobs performed out of [the] Louisville office," and "for procuring the necessary materials for those jobs." No. 3:06-CV-372-S, 2008 U.S. Dist. LEXIS 34683, at *6 (W.D. Ky. Apr. 26, 2008). The court in *Miles* also referred to this employee as representing the "face of" his employer. 2008 U.S. Dist. LEXIS 58430, at *20.

AWP seems to consider it self-evident that Kirby's conduct amounts to a breach of fiduciary duty, as AWP does not bother to provide any authority to support the claim that Kirby "act[ed] unfairly or otherwise injure[d] his principal before [his] departure." *See* DN 106, PageID# 2045-46. "At-will employees are free to pursue new employment opportunities without breaching their duty to their current employer." *McHutchinson, Inc. v. Eason Horticultural Resources, Inc.*, CV 21-65-DLB-CJS, 2021 WL 2555568, at *4 (E.D. Ky. June 22, 2021). That the employment opportunities being pursued by Former Employees were with a competing business is of no import, as the Court has determined the noncompete provision of the Employment Agreement to be unenforceable. Thus, even if the Court found that Kirby owed AWP a fiduciary duty, there is no basis for concluding that, by discussing employment opportunities with his coworkers and providing Safe Zone with the names and phone numbers of interested AWP employees, Kirby "acted unfairly or otherwise injured" AWP prior to his separation.

Finally, though AWP maintains that it can pursue its claim against Kirby, Miller, Cheeks, and McLean without showing that AWP suffered a loss, AWP has not evidenced any gain that these four employees are purported to have realized from their alleged breach of duty. For this reason and all those previously discussed, AWP's claim cannot withstand summary judgment.

X. *Unfair Competition*

In Kentucky, "'unfair competition consists of either (1) injuring the plaintiff by taking his business or impairing his good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his good will.'" *Act for Health v. United Energy Workers Healthcare Corp.*, 784 F. App'x 295, 299 (6th Cir. 2019) (quoting *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 139 (Ky. 1969)). More recently, the unfair competition tort has been "extended to outlawing 'parasitism' under the principle that one may not appropriate a

competitor's skill, expenditures, and labor." *Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 871 (Ky. Ct. App. 2007).

AWP appears to rest its claim in this latter, more encompassing definition on of unfair competition, alleging that "Safe Zone embarked on a systematic campaign to unfairly compete with AWP" by "raid[ing] numerous former employees of AWP, depart[ing] from common business integrity in ignoring the Employment Agreements, and reaped the benefit of substantial revenue made off of AWP's former employees." DN 106, PageID# 2047. AWP maintains that "[a] jury could easily conclude that Safe Zone intended to unfairly capitalize on the time and expense AWP invested in the employees." *Id.*, PageID# 2048. AWP cites no authority showing that a Kentucky court would find that hiring employees *en masse* from a competitor, particularly employees who are not under an enforceable noncompete agreement, constitutes an "unfair" business practice. Regarding the federal cases that AWP cites, the information before the Court is inadequate for the Court to determine whether those cases are factually analogous to the instant case.[30]

Equally important, AWP has not established that Safe Zone intended to deceive the public, which is essential to a claim of unfair competition. *Raheel Foods, LLC v. Yum! Brands, Inc*., No. 3:16-CV-00451-GNS, 2017 U.S. Dist. LEXIS 6524, at *21 (W.D. Ky. Jan. 18, 2017) ("[T]he *Covington Inn* court did note that one form of unfair competition is injuring the plaintiff by taking his business.. . . This clause however, cannot be read in isolation. The opinion as a whole does not support Plaintiffs' broad conception of unfair competition because it makes clear that actual or

---

[30] The court's finding in *KCH Services v. Vanaire*, indicates that the plaintiff offered enough evidence for the unfair competition claim to survive summary judgment, but does not speak to the underlying facts of the case. No. 05-777-C, 2009 U.S. Dist. LEXIS 63174, at *2–*3 (W.D. Ky. July 14, 2009). The holdings in *Greif, Inc. v. MacDonald* and *Auto Channel, Inc. v. Speedvision Network, LLC* were both limited to whether the unfair competition claims were preempted by KUTSA. No. 3:06CV-312-H, 2007 U.S. Dist. LEXIS 14617, at *5 (W.D. Ky. Mar. 1, 2007); 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001).

intended deception of the public is an essential element of the tort.") (citing *Covington Inn*, 445 S.W.2d at 139) (internal quotation marks omitted). AWP argues that Safe Zone "attempted to deceive the general public" by stating on its website that "it personally trains and certifies all new hires, when the evidence shows that Safe Zone merely relied upon the training and certifications AWP's former employees previously obtained while employed by Safe Zone." DN 54, PageID# 727; DN 106, PageID# 2048. Even if the statement on Safe Zone's website regarding the training of its employees is indeed false,[31] "this theory of deception has no support in Kentucky caselaw, which requires that the deception relate to the source or origin of the goods or services." *Act for Health*, 784 F. App'x at 301 (citing *Kenney*, 269 S.W.3d at 871). There is no evidence that Safe Zone attempted to "pass off" the source or origin of its traffic control services.

Because, in addition to causation and damages, AWP has failed to establish multiple essential elements of its unfair competition claim, Safe Zone is entitled to summary judgment.

XI.   *Civil Conspiracy*

AWP's claim that "Defendants conspired and agreed with one another to commit the various unlawful acts described [in the complaint] to advance Safe Zone's business interest to the detriment of AWP . . . and attempting to conceal the foregoing unlawful acts from AWP and the general public" must be dismissed, as AWP has not evidenced that any Defendant engaged in any of the alleged unlawful acts.

XII.   *Nominal Damages*

In the briefing, AWP raises the specter of "nominal damages." *E.g.*, DN 96-1, PageID# 1652; DN 106, PageID# 2040. Such damages are permissible under Kentucky law, *see Acuity*

---

[31] There is evidence in the record that Safe Zone does, in fact, provide its newly hired employees with training. Miller Depo., DN 95-10, PageID# 1336. That some of the protectors hired by Safe Zone from AWP already had ATSAA credentials and did not need to acquire new certifications does not undermine this evidence.

*Brands, Inc. v. Bickley*, CV 13-366-DLB-REW, 2017 WL 1426800, at *26 (E.D. Ky. Mar. 31, 2017), but it not clear whether nominal damages would be available to AWP under Ohio law, *see Princeton Radiology Assocs. v. Advocate Radiology Billing & Reimbursement Specialists*, No. 2:19-cv-2311, 2022 U.S. Dist. LEXIS 32093, at *8-*9 (S.D. Ohio Jan. 3, 2022). Nonetheless, the Court need not decide this issue because there is no viable contract claim under which AWP could recover nominal damages against any Defendant.

XIII.    *Injunctive Relief*

For the reasons outlined in this opinion, the Court finds that AWP cannot establish a likelihood of success on the merits of any claim that it asserts against any Defendant. As such, the Court will deny injunctive relief.

XIV.    *Conclusion*

The Court will grant in a separate order summary judgment in favor of Defendants on all counts in the complaint asserted by AWP against Defendants. Defendants' motion to exclude the testimony of Sam Myers will be denied as moot and AWP's motions for leave to seal documents will be granted. AWP's motion for partial summary judgment on Counts I and II will be denied.

The Court notes that Amber Cheeks ("Cheeks"), a *pro se* defendant to this case, has not joined Defendants' motion for summary judgment. Had Cheeks joined Defendants' motion, the dispositive issues which require summary judgment in favor of Former Employees who worked as protectors for AWP would apply equally to her. As such, the claims against Cheeks will be dismissed without prejudice.

Regarding Defendants Herman White, Sebastian Williams, Cherise Dye, Larry Cummings, and Ciara Simcoe, though they are not presently before the court, there is no evidence in the record that they received service of process and, thus, the claims against these defendants will be

dismissed without prejudice pursuant to Fed. R. Civ. Pro. 4(m). Had these defendants joined Defendants' motion for summary judgment, the dispositive issues which require summary judgment in favor of Former Employees who worked as protectors for AWP would apply equally to them.

March 31, 2022

Charles R. Simpson III, Senior Judge
United States District Court

35